UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANKLIN FIGUEROA,<br><br>                    Petitioner,<br>vs.<br><br>MATTHEW CATE, Secretary,<br><br>                    Respondent. | CASE NO. 12-CV-00416-H (BLM)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

On February 15, 2012, Franklin Figueroa ("Petitioner"), a California state prisoner proceeding pro se and in forma pauperis, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his conviction. (Doc. No. 1.). On May 22, 2012, Matthew Cate ("Respondent") filed a response in opposition. (Doc. No. 9.) Petitioner did not file a traverse. On October 19, 2012, the magistrate judge issued a report and recommendation to deny the petition. (Doc. No. 11.) Petitioner has not filed an objection to the magistrate judge's report to date. For the following reasons, the Court denies the petition for writ of habeas corpus.

## BACKGROUND

Petitioner seeks relief from a jury conviction of second degree murder and his sentence of 25 years to life in prison. (Doc. No. 1.) The following facts come from the California Court of Appeal opinion and are presumed correct pursuant to 28 U.S.C. §

2254(e)(1).

In the early morning hours of October 2, 2004, Antonio Rosales, Jr., was killed during a fight that occurred at a driveway across the street from his residence on Milbrae Street in San Diego. He died from blunt force injuries to his head.

Victim Rosales was a member of the Logan gang, and the assailants were members of the Van Dyke Krew (VDK) gang. There were four VDK gang members (including [Petitioner]) involved in the fight. Two of them, Genri Hernandez and Abel Jimenez, pleaded guilty to voluntary manslaughter and testified on behalf of the prosecution. They identified [Petitioner] and Rogelio Valadez as among the persons who assaulted Rosales. Julio Martinez, who associated with VDK gang members and who witnessed the fight from inside a car, testified on behalf of the prosecution upon a grant of immunity. Rosales's friend, Ricardo Anaya, who participated in the fight, also testified for the prosecution.

The prosecution charged [Petitioner] with first degree murder, with enhancements for personal use of a deadly weapon and committing a crime to benefit a gang. During trial, the court granted the prosecution's motion to dismiss the personal weapon use allegation. The jury acquitted [Petitioner] of first degree murder, and found him guilty of second degree murder. It also found true the gang enhancement allegation.

VDK members Hernandez and Jimenez, VDK associate Martinez, and Rosales's friend (Anaya) described the events surrounding the fight. FN1. In the hours before the fight, Hernandez, Jimenez, and Martinez, plus [Petitioner] and Valadez, were together drinking alcohol and smoking marijuana. Another man who had joined the group (Hugo Alvarez) told them that he knew where to get some marijuana, and invited them to go with him. The men left in two vehicles and drove to Milbrae Street. Hernandez drove his gray Oldsmobile, with Valadez and Jimenez as passengers. [Petitioner] drove Alvarez's white Ford Focus, with Alvarez and Martinez as passengers. [Petitioner] parked the white car by a house, and Hernandez parked his car on the next block. Alvarez got out of the white car and went to a house to get marijuana. While the men were waiting for Alvarez's return, Valadez got out of the gray car and started "tagging" graffiti. Valadez wrote the words "VDK First" on a fire hydrant, which was a reference to the VDK gang and Valadez's moniker "First."

> FN1. Hernandez's testimony, provided during a conditional examination, was read to the jury. Hernandez was examined prior to trial because it was expected that he would be deported by the time of trial.

Meanwhile, Anaya and Rosales arrived at Milbrae Street in Anaya's car. When they arrived, Anaya saw two or three men on the other side of the street standing behind a white car. FN2. While Anaya was parking the car in front of Rosales's home, Rosales got out of the car and walked towards where the men were standing.

> FN2. By the time of trial Anaya did not recall the color of the car that the men were standing behind. However, when interviewed by the police a couple of hours after the fight he described the vehicle

as a white car.

A fight ensued, but none of the witnesses saw exactly how it started. Anaya testified that Rosales did not approach the men in an aggressive fashion, and Anaya thought Rosales knew them. Martinez (who stayed in the white car during the fight) testified that he heard people screaming and cussing, saying " 'what's up mother-fucker?' " as if they wanted to fight, and he then saw [Petitioner] "running" out of the car. Martinez testified he could not see much of the fight because he was hit in the eye by someone through the car window and it was dark. Martinez did not know who punched him, but he thought it was "gang-related." Martinez saw people with baseball bats near the white car, and thought he saw Jimenez with a bat.

At the start of the fight, Anaya noticed that Rosales had a man down on the ground. Anaya started fighting with one of the men by the white car, and chased one of the men when he started running down the street. However, when more men from another car joined the fight and started hitting Anaya, Anaya jumped a fence into a yard. As Anaya ran away, Rosales was still standing and he was not bleeding from the head. Anaya saw a man going towards Rosales with a bat.

Jimenez testified that Valadez (who had been "tagging" adjacent to the gray car) knocked on the window of the gray car, said "somebody was fighting down the street," and then ran towards the fight. Jimenez and Hernandez each grabbed a bat from the trunk of Hernandez's car and also ran towards the fight. Both Jimenez and Hernandez testified that they went to Milbrae Street to get marijuana, not to get into a fight, but they stated that when a gang member is involved in a fight, other gang members are expected to help, and if they do not they would probably be beaten.

Jimenez testified that as they ran towards the area of the fight, [Petitioner] was running towards them and Rosales was running away. When [Petitioner] saw his friends coming, he "turned around." [Petitioner], Jimenez, and Valadez then chased Rosales. FN3. Jimenez hit Rosales in the back with the bat and Rosales fell. Jimenez was about to hit Rosales again, but [Petitioner] took the bat from him. Valadez was kicking Rosales in his head or upper body, and [Petitioner] was hitting him with the bat on his upper body. FN4. At this point Jimenez went into the white car to look for the car keys so they could get away. He was surprised to see Martinez (who appeared to be crying) in the car because Martinez should have been outside helping with the fight.

> FN3. Jimenez testified he did not know Rosales, and it appears Hernandez did not know him either.

> FN4. When the prosecutor asked Jimenez if [Petitioner] was hitting Rosales's head with the bat, Jimenez answered, "Most likely."

Hernandez testified that as he ran towards the fight, he saw Valadez and [Petitioner] fighting with Rosales. [Petitioner] was punching Rosales with his fists while Rosales was on the ground. Hernandez chased another man (apparently Anaya) until Anaya jumped a fence and went into a backyard. At this point, Hernandez's view of the fight was obscured by the white car. However, he could see that Valadez and [Petitioner] were still fighting

with Rosales. Valadez was kicking and punching Rosales, but Hernandez could not see what [Petitioner] was doing.

Anaya returned to the street and threw some beer bottles that he found in the yard where he had fled. The assailants started running away and left the scene in the two cars. When Anaya went to Rosales, he was laying on the ground bleeding from his head. Anaya told a neighbor to call 911.

[Petitioner] left the scene in the white car, accompanied by Martinez. While in the car with defendant, Martinez stated, " 'Man, I didn't even help you.' " Martinez explained that he said this because [Petitioner] was "getting jumped" and he was supposed to help him because he was "hanging around" with him. [Petitioner], who appeared angry, told Martinez to calm down and "shut up."

The men drove the two cars to an alley. Hernandez and Martinez testified that [Petitioner] and Jimenez wiped the white car with a rag to remove fingerprints. Jimenez then drove the white car to his home so he could return the car to Alvarez. FN5. Before he could contact Alvarez, the police arrived and seized the white car. The authorities found [Petitioner's] fingerprints on the white car.

> FN5. Alvarez (who was Jimenez's neighbor) had been left at the scene of the fight.

After the fight, Hernandez and Jimenez noticed blood on Valadez's shoes. Hernandez testified he did not remember seeing any blood on [Petitioner's] clothes. Hernandez and Jimenez recounted various statements made by [Petitioner] after they left the scene of the fight. [Petitioner] told them he hit the victim "hard" and stated the victim was bleeding "bad" from his head. [Petitioner] said they should stay quiet and not say anything about the fight; if they talked it would be "snitching"; and there "could be trouble" (like a beating or stabbing) for anyone who talked about the fight. About one or two weeks after the fight, [Petitioner] acknowledged to Hernandez that he grabbed the bat from Jimenez. [Petitioner] also stated that detectives had already talked to him and asked him what had happened; if he found out "who was telling on him" he was going to "do something about it," like beat or stab that person.

A gang expert testified regarding the primary activities of the VDK gang, including committing assaults with deadly weapons. The expert stated that Rosales's homicide occurred in territory claimed by the Shelltown gang. The expert opined that the killing of Rosales benefitted the VDK gang because it enhanced the gang's status and instilled fear and intimidation in the community so that people would not talk to the police.

The jury convicted [Petitioner] of second degree murder with a true finding that he committed the crime to benefit a gang. He was sentenced to 15 years to life for the murder, plus a determinate term of 10 years for two serious felony prior convictions. FN6.

> FN6. No additional term was imposed for the gang enhancement because of the life term applicable to second degree murder. (See People v. Lopez (2005) 34 Cal.4th 1002.).

(Lodgment No. 5 at 2-7.)

Petitioner appealed his conviction on six separate grounds. He claimed that he was denied his right to counsel of his own choosing and to self-representation. (Lodgment No. 4 at 1-6.) He further asserted that he was denied due process when his motion for a continuance was denied. (Id.) Additionally, he disputed the jury instruction regarding accomplice testimony and contrived self-defense. (Id. at 6-11.) Finally, he argued that there was insufficient evidence to support the gang enhancement charge. (Id. at 11-12.) The California Court of Appeal affirmed the judgment of the trial court on November 19, 2010. (Lodgment No. 5.) On February 23, 2011, the California Supreme Court summarily denied the petition for review of the appellate court's decision without citation or authority. (Lodgment No. 7.) On February 15, 2012, Petitioner filed the present Petition, raising the same claims that he had previously raised in his state court appeal. (Doc. No. 1.) He argues that the California courts erred in affirming his conviction because the trial court violated his Sixth and Fourteenth Amendment rights. (Doc No. 1.)

## DISCUSSION

### I.     Standard of Review

A petitioner challenging a state court conviction in federal court can only do so on the grounds that his custody is in violation of the United States Constitution or the laws of the United States. 28 U.S.C. § 2254(a). Pursuant to 28 U.S.C. § 2254(d), a federal court must not grant a habeas petition unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court."

"Clearly established federal law" refers to existing decisions handed down by the United States Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). A state court decision is contrary to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in the [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a [Supreme Court decision]," yet arrives at a result different from that decision. Williams v. Taylor, 529

U.S. 362, 405-06 (2000). A state court decision involves an unreasonable application of clearly established federal law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Penry v. Johnson. 532 U.S. 782, 792 (2001) (quoting Williams, 529 U.S. at 407-08) (internal quotation marks omitted). The state court's application of the law must be more than merely incorrect or erroneous. Lockyer, 538 U.S. at 75. It must be objectively unreasonable, such that fairminded jurists could not possibly disagree that it conflicts with U.S. Supreme Court precedent. See Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

If no reasoned decision is available from the state's highest court, these standards are applied to the last reasoned state court decision. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991). Because the California Supreme Court denied Petitioner's petition for review summarily and without statement of reasoning or citation of authority, this Court will review the California appellate court's reasoning to determine whether it is contrary to or an unreasonable application of clearly established federal law. (Lodgment No. 7.)

**II.   Analysis**

**A.   Denial of Right to Counsel of Choice**

Petitioner argues that his constitutional rights to counsel and to a fair trial were violated when the trial court refused to allow him to discharge his retained counsel. (Doc. 1 at 6.) The Sixth Amendment right to assistance of counsel encompasses the right of a criminal defendant to retain counsel of his own choosing. See U.S. v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). The right to choice of retained counsel, in contrast to the right to effective assistance of counsel, is not merely the right to be assisted by a qualified attorney, nor to a fair trial, but to be "defended by counsel [the criminal defendant] believes to be the best." Id. at 146. The Supreme Court in Gonzalez-Lopez explained that "the deprivation of this right is complete when the defendant is erroneously prevented from being represented by the lawyer he wants,"

regardless of whether or not his attorney provided effective assistance under Strickland. Id. at 148. The Court clearly established, however, that the right is not absolute, and must be balanced against "the needs of fairness and the needs of [the court's] calendar." Gonzalez-Lopez, 548 U.S. at 152 (embedded citations omitted). Trial courts are granted extreme latitude in balancing these interests. Miller v. Blacketter, 525 F.3d 890, 895 (9th Cir. 2008) (citing Gonzalez-Lopez, 548 U.S. at 140).

In determining whether Petitioner was denied his right to retained counsel of his choosing, the California Court of Appeal applied a standard that is consistent with Supreme Court precedent. The court stated that:

> A criminal defendant has the right to discharge his or her retained attorney without cause. However, the right is not absolute; the trial court has discretion to deny such a motion if discharge will result in significant prejudice to the defendant, or if it is not timely, i.e., if it will result in disruption of the orderly processes of justice. The court should balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.

(Lodgment No. 5 at 13.)

The appellate court concluded that the trial court reasonably denied Petitioner's motion because "the request to discharge counsel was made on the date set for trial and there was no convincing showing of a need for new counsel..." (Lodgment No. 5 at 15.) The court found that Petitioner's request, which was made on the date trial was set to begin - six months after charges were filed and four years after the commission of the crime - was untimely. (Id. at 14.) It noted that Petitioner's counsel had been representing him for five months and was prepared to argue the case, while no new counsel was prepared to take over, and a continuance causing substantial delay and burden on the court would have been required. (Id.) The court further noted that Petitioner's proffered reason for his request did not warrant the delay. (Id.) Petitioner complained that his counsel withheld numerous documents until the day before trial and was not accurately describing their contents. (Id.) His counsel, however, contradicted these claims. (Id. at 14-15.) The appellate court therefore concluded that denial of Petitioner's request was properly within the trial court's discretion. (Id. at 14.)

In light of the discretionary standard established by the Supreme Court, the state court's conclusion that the delay in the proper administration of justice outweighed Petitioner's interest in discharging his retained counsel was not objectively unreasonable. Because the court's decision was in accordance with clearly established federal law, Petitioner's right to counsel claim fails. See Lockyer, 538 U.S. at 76.

### B. Denial of Right to Self-Representation

Petitioner argues that his Sixth Amendment rights were violated when the trial court denied his request for self-representation. The clearly established Supreme Court law on the right to self-representation is governed by Faretta v. California. 422 U.S. 806 (1975). The right to self-representation is embedded in the Sixth Amendment, and applies to the states through the Fourteenth Amendment. Id. at 835. To invoke this right, however, the criminal defendant must assert it "knowingly and intelligently." Id. In addition, the request for self-representation must be "clear and unequivocal." Id. If the criminal defendant, after being warned of the "dangers and disadvantages of self-representation," clearly and unequivocally requests self-representation, the sixth amendment generally affords him this right. Id. The right, however, is not absolute, and most courts require that the request be made in a timely manner. Martinez v. Court of Appeal of California, Fourth Appellate District, 528 U.S. 152, 161-62 (2000).

The California Court of Appeal concluded that the trial court properly denied Petitioner's request for self-representation because the request was untimely and was not unequivocal. (Lodgment No. 5 at 16-17.) Both of these grounds are consistent with Supreme Court precedent. "No Supreme Court has directly addressed the timing of a request for self-representation;" however, Faretta recognized that a request made "weeks before trial" should be granted. Marshall v. Taylor, 395 F.3d 1058, 1060 (9th Cir. 2005). State courts are free to determine when Faretta motions become untimely as long as their standards comport with the Supreme Court's holding that a request made "weeks before trial" is timely. Faretta, 422 U.S. at 835; Marshall, 395 F.3d at 1061. In the present case, Petitioner made his request for self-representation on the day

trial was set to begin. (Lodgment No. 5 at 16.) Because the request was not made weeks before trial, the court's conclusion that the day-before-trial request was untimely was consistent with Supreme Court precedent. See Marshall, 395 F.3d at 1061; Perez v. Marshall, 946 F. Supp. 1521, 1536-37 (S.D. Cal. 1996).

Additionally, the state court concluded that Petitioner's request was not unequivocal, noting that he continuously fluctuated between requesting self-representation and requesting new counsel. (Lodgment No. 5 at 18.) When the trial court asked if Petitioner still wanted to represent himself with standby counsel, Petitioner indicated he was "confused and needed more time to think." A court need not grant an ambivalent request for self-representation. Faretta, 422 U.S. at 835; United States v. Mendez-Sanchez, 563 F.3d 935, 946 (9th Cir. 2009) (finding that the defendant's indication that he believed it would be better if he were represented by different counsel rendered his request for self-representation equivocal).

Petitioner is not entitled to habeas relief on the basis that he was denied his Sixth Amendment right to self-representation. The state court's denial of his request for self-representation on the basis that it was untimely and equivocal is not contrary to or an unreasonable application of clearly established federal law.

### C. Request for Continuance

Petitioner argues that the trial court violated his due process rights by refusing to grant him a continuance. (Doc. No. 1 at 12-13.) Specifically, Petitioner alleges that his request of a two-day continuance was made in good faith and would not have caused an undue delay in the proper and efficient administration of justice. (Doc. No. 1 at 13.) Further, Petitioner contends that the benefit he would have received from the continuance outweighs any efficiency concerns of the court. (Doc. No. 1 at 13.) He contends that reviewing the documents he was provided just prior to trial would have allowed him to help in planning his defense strategy, and would have resolved the insecurities he had with his attorney. (Doc. No. 1 at 13.) The California Court of Appeal concluded that the trial court did not abuse its discretion in denying the request

for a continuance because Petitioner lacked good cause and was not prejudiced by the ruling. (Lodgment No. 5 at 7-8.)

The United States Supreme Court has clearly established that trial courts have broad discretion in determining whether or not to grant a requested continuance. Morris v. Slappy, 461 U.S. 1, 11 (1983). Only "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" amounts to a denial of due process. Id. at 11-12 (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)). To determine whether a denial of a continuance is arbitrary, the court must look to the circumstances of each case and to the reasons for the request offered by the defendant at trial. Ungar, 376 U.S. at 589.

The state court's denial of a continuance was not contrary to, or an unreasonable application of, clearly established federal law. The California Court of Appeal rejected Petitioner's reasoning for his request, finding that the circumstances did not indicate that he "needed to personally review the documents before the start of trial to ensure a fair trial." (Lodgment No. 5 at 19.) The trial record supports this finding. The trial court denied Petitioner's request for additional time to think and to review documents that it noted had already been explained to him by an attorney who was "fighting hard" for and "vigorously defending" Petitioner. (Lodgment No. 8-3 at 8 & 12-13.) In addition to a lack of prejudice, the court found that a continuance would have presented a significant inconvenience to the court and the prosecution as jury selection was already set to begin and witnesses were waiting on standby. (Lodgment No. 8-3 at 14.) The record fails to indicate that the denial for a continuance was unreasoning or arbitrary. Petitioner is therefore not entitled to habeas relief on his continuance claim.

**D.    Jury Instructions**

In his fourth and fifth claims, Petitioner argues that the trial court improperly instructed the jury with regards to the accomplice testimony and his claim of self-defense, which amounted to a violation of his constitutional due process rights. A habeas petitioner challenging the constitutionality of his conviction on the basis of

instructional error must show that the instruction was not merely erroneous, "but itself...so infected the entire trial that the resulting conviction violates due process." See Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). An instruction that is allegedly erroneous solely under state law is insufficient for habeas review. Estelle v. McGuire, 502 U.S. 62, 71 (1991). The reviewing court must establish that "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution" in order to grant habeas relief. Id. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). The trial court's instructions must be viewed in context with all other instructions and the record. Estelle, 502 U.S. at 72.

### i.     Omissions from Accomplice Instructions

Petitioner argues that the trial court prejudicially erred by omitting, from California's standard jury instruction, the warning that accomplice testimony must be corroborated and should be viewed with caution. (Doc. No. 1 at 14.) The California Court of Appeal agreed that this portion was erroneously omitted, but concluded, however, that there was no resulting prejudice to Petitioner. (Lodgment No. 5 at 20.) To the extent Petitioner contends the omissions violated California state law, habeas relief is inappropriate. See Estelle, 502 U.S. at 68 (stating that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). However, Petitioner additionally contends that the omission violated his constitutional due process rights. (Doc. No. 1 at 16.)

The California Court of Appeal found that Petitioner's conviction did not warrant reversal because there was "no reasonable probability the jury's verdict was affected by the court's failure to explicitly tell the jury to view the accomplice testimony with caution." (Lodgment No. 5 at 21.) This standard is consistent with Supreme Court precedent. Petitioner has failed to show that the omitted parts of the jury instruction so infected the trial that the conviction violates due process. Due process requires that the State prove each element of a criminal offense beyond a

1  reasonable doubt. See In re Windship, 397 U.S. 358, 364 (1970). While the California
2  Court of Appeal determined that the trial court erred in failing to instruct the jury that
3  the accomplice's testimony must be viewed with caution, this determination was based
4  solely on state law. (Lodgment No. 5 at 20.) The omission does not amount to a
5  constitutional violation as it had no bearing on the State's burden of proving each
6  element of the crime beyond a reasonable doubt. See Waddington v. Sarausad, 555
7  U.S. 179, 193 (2009) (finding no constitutional violation for a jury instruction that
8  could not have been applied in a manner that would relieve the State's burden of
9  proving each element beyond a reasonable doubt).

10  Further, the California Court of Appeal found the erroneous omission to be
11 harmless because the caution instruction was implied through other instructions.
12 (Lodgment No. 5 at 20.) The jury was instructed that factors such as potential bias or
13 prejudice, prior convictions, and the promise of leniency in exchange for testimony
14 could be considered in evaluating a witnesses credibility. (Id. at 21.) Moreover, both
15 accomplice witnesses, Hernandez and Jimenez, were thoroughly cross-examined about
16 their initial falsehoods, "their plea agreements with the prosecution and hope for
17 leniency, and their motivation to place blame on [Petitioner]." (Id.) On this basis, the
18 appellate court found that the jury sufficiently understood that accomplice testimony
19 should be viewed with caution. (Id.) Thus, even if the omission was erroneous under
20 constitutional law, there was no resulting prejudice entitling Petitioner to habeas relief.
21 See Pulido v. Chrones, 629 F.3d 1007 (9th Cir. 2010) (finding that even if the error in
22 jury instructions amounted to constitutional error, habeas relief is only warranted if the
23 record, considered as a whole, demonstrates that Petitioner suffered resulting
24 prejudice).

25  Petitioner additionally argues that the trial court erred in not instructing the jury
26 that California's corroboration requirement of accomplice testimony is not satisfied
27 solely by the testimony of another accomplice. (Lodgment No. 5 at 22.) The California
28 Court of Appeal, however, determined that even if the trial court erred in omitting this

1  instruction, the omission did not prejudice the defendant. <u>Id.</u> The evidence supports
2  this conclusion:

> "[T]he jury was told that Hernandez and Jimenez were accomplices; that it could not convict based on the testimony of an accomplice alone; that it could use the testimony of an accomplice to convict only if there was supporting evidence independent of the accomplice's testimony; and that the rule permitting reliance on a single witness's testimony to establish a fact did not apply to Hernandez and Jimenez."

(Lodgment No. 5 at 22-23.)

Further, the testimony of Hernandez and Jimenez was sufficiently corroborated by independent evidence, including non-accomplice testimony, expert testimony, and non-testimonial evidence. (Lodgment No. 8-5 at 75-87; Lodgment No. 8-6 at 120-127; Lodgment No. 8-7 at 35-111.) The California Court of Appeal's determination that the omission did not result in error was not objectively unreasonable.

The state court's rejection of Petitioner's prejudicial error claim regarding the jury instructions was not contrary to, or an unreasonable application of, federal law. Because the evidence indicates that the jury understood it must evaluate accomplice testimony with caution and that accomplice testimony cannot be corroborated with the testimony of another accomplice, and because there was sufficient independent corroborating evidence, Petitioner fails to show that there was a reasonable likelihood that the jury applied the instructions in a way that violates the Constitution. Accordingly, Petitioner is not entitled to habeas relief on his claim of erroneous omissions in the jury instruction.

### ii. Instruction on Contrived Self-Defense

Petitioner argues that his due process rights were violated when the trial court omitted from the contrived self-defense instruction the exception that self-defense is available if the victim responds with sudden deadly force to a non-deadly provocation. (Doc. No. 1 at 20-22.) The California Court of Appeal found that the instruction was proper, because "the contrived self-defense principle by its nature precludes the defendant's reliance on self-defense." (Lodgment No. 5 at 27.)

The state court's opinion was consistent with clearly established federal law.

The jury was given two separate instructions on the right to self-defense. First, the jury was given the instruction based on California Criminal Jury Instruction 3471, which allows an initial aggressor to claim self-defense if he communicates to the victim that he has withdrawn from the fight and the victim continues to fight. (Lodgment No. 5 at 25.) This instruction includes a caveat "providing that if the defendant was using nondeadly force, and the victim responded with such sudden and deadly force that the defendant could not withdraw, then the defendant may defend with deadly force without withdrawing." (Lodgment No. 5 at 25.) The jury was further provided California Criminal Jury Instruction 3472, which states that "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Petitioner contends that the caveat from the first instruction regarding self-defense by an initial aggressor should have been included in the second instruction regarding contrived self-defense. (Doc. No. 1 at 22.) The California Court of Appeal noted that "the contrived self-defense instruction . . . properly instructs the jury to evaluate the defendant's intent to determine whether the claim of self-defense was legitimate or engineered, and informs the jury that self-defense is unavailable in the latter situation." (Lodgment No. 5 at 26.)

The record does not support a finding that the jury applied the instructions in a manner that violated the Constitution. Reading the instruction as a whole, it was clear that when the initial aggressor is met with sudden and deadly force, he is entitled to a claim of self-defense. The omission, therefore, did not amount to a due process violation because the state's burden of proof was not lessened. See Middleton v. McNeil, 541 U.S. 433, 436-37 (2004). Further, even if the jury instructions were incomplete, this error did not prejudice Petitioner. The record is devoid of any evidence from which the jury could reasonably conclude that Petitioner acted in self-defense. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (finding that habeas petitioners are only entitled to relief if they can establish that erroneous jury instructions resulted in actual prejudice). The victim was unarmed and outnumbered,

and Petitioner did not sustain any serious or life threatening injuries. (Lodgment No. 5 at 5-8.) The omitted caveat thus had no "substantial or injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 638. Accordingly, the state court's decision was not contrary to or an unreasonable application of clearly established federal law, and Petitioner is not entitled to federal habeas relief.

### F.   Sufficient Evidence to Support Gang-Enhancement

Petitioner argues that his due process rights were violated because the prosecution failed to present sufficient evidence at trial to support a gang-enhancement. (Doc. No. 1 at 25.) Specifically, Petitioner argues that the testimony of the prosecution's gang expert, who was not present during the commission of the offense, was insufficient to prove, beyond a reasonable doubt, that Petitioner's conduct was for the benefit of, at the direction of, or in association with a criminal gang. (Id.) Petitioner contends that "some independent evidence from [the] commission of the crime itself" was required to sustain the gang-enhancement. (Id.) The California Court of Appeal concluded that the circumstances of the case provided sufficient evidence for the jury to infer that the crime was gang-related. (Lodgment No. 5 at 29-30.)

A habeas petitioner challenging a state criminal conviction based upon insufficiency of the evidence is entitled to relief "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilty beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). If, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt, then habeas relief is inappropriate. Id. If the record contains facts that support conflicting inferences, the reviewing court must presume that the trier of fact resolved any conflicts in favor of the prosecution and defer to that determination. Id. at 326. In evaluating a sufficiency of the evidence claim, the reviewing federal court must look to the applicable state law defining the substantive elements of the crime. Id. at 324 n. 16.

According to section 186.22(b)(1) of the California Penal Code, additional punishment applies if the prosecution proves beyond a reasonable doubt that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." While gang membership alone is insufficient to establish the gang enhancement, People v. Gardley, 14 Cal. 4th 605, 623 (1996), expert testimony regarding the importance of status and respect within gangs can be sufficient to support gang enhancements for convictions of known gang members. People v. Albillar, 51 Cal. 4th 47, 59-63 (2010) (finding that the expert testimony, in light of the factual evidence showing gang affiliation, was sufficient for a reasonable jury to find that defendant's crime was gang-related).

Petitioner has failed to show that there was insufficient evidence to support gang enhancements on his conviction. The jury heard testimony that Petitioner was running away from the fight when, upon seeing his fellow gang members running toward him, he turned around and joined in chasing and beating the victim. (Lodgment No. 8-6 at 119-35 & 180-87; Lodgment No. 8-7 at 5-21 & 124-37.) Hernandez, Jimenez, and Martinez, Petitioner's fellow gang-members, all testified that gang culture dictates that all gang members are expected to participate in a fight when a fellow member is involved. (Lodgment No. 8-6 at 7-24; Lodgment No. 8-7 at 24 & 159.) Additionally, Detective Garcia, an expert on street gangs, testified that when a fight breaks out, other gang members who are present are expected to assist in the fight. (Lodgment No. 8-7 at 56); see Emery v. Clark, 643 F.3d 1210, 1216 (2011) (finding that the jury's reliance on the testimony of the prosecution's gang expert constituted sufficient evidence to support a gang-enhancement). Petitioner removed incriminating evidence from the car, and threatened other gang members to refrain from talking to authorities. (Lodgment No. 8-7 at 17-18 & 131-32.) As such, the prosecution presented sufficient evidence to support the gang enhancement.

A reasonable jury could find on the evidence presented that Petitioner committed

the crimes with the required intent under California's gang enhancement statutes. The California Court of Appeal reasonably applied the Supreme Court standard for claims of insufficient evidence. Accordingly, Petitioner is not entitled to habeas relief on his insufficiency of the evidence claim.

### III.  Denial of Certificate of Appealability

Under AEDPA, a state prisoner seeking to appeal a district court's denial of a habeas petition must obtain a certificate of appealability from the district court judge or a circuit judge. 28 U.S.C. § 2253(c)(1)(A). A court may issue a certificate of appealability only if the applicant has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim," the minimal showing required to satisfy § 2253(c) is "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). In the present case, the Court concludes that Petitioner has not made such a showing and therefore the Court denies Petitioner a certificate of appealability.

### CONCLUSION

The California Court of Appeal did not rule contrary to, or unreasonably apply, clearly established federal law. Based on the foregoing, the Court denies with prejudice Petitioner's petitioner for writ of habeas corpus and denies a certificate of appealability.

**IT IS SO ORDERED.**

Dated: April 8, 2013

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT